Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Frank P. Tiscione, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Liberty Mutual Insurance Company,
Liberty Mutual Fire Insurance Company, Liberty Insurance
Corporation, The First Liberty Insurance Corporation, LM
Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance
Company, Liberty County Mutual Insurance Company, LM
Property and Casualty Insurance Company, Safeco Company
of Indiana, and American States Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------- X

LIBERTY MUTUAL INSURANCE COMPANY,
LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY INSURANCE CORPORATION,                                    Docket No.:
THE FIRST LIBERTY INSURANCE CORPORATION,
LM INSURANCE CORPORATION,
LIBERTY MUTUAL MID-ATLANTIC INSURANCE COMPANY,
LIBERTY COUNTY MUTUAL INSURANCE COMPANY,          **Plaintiff Demands a Trial**
LM PROPERTY and CASUALTY INSURANCE COMPANY,       **by Jury**
SAFECO COMPANY OF INDIANA, and
AMERICAN STATES INSURANCE COMPANY,

                                        Plaintiffs,

                         -against-

ELENA BORISOVNA STYBEL, M.D., and JOHN DOE
DEFENDANTS "1-10,"

                                        Defendants.
--------------------------------------------------------------------------------X

## <u>COMPLAINT</u>

        Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company,

Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance

Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company (collectively "Liberty Mutual" or "Plaintiffs"), as and for their Complaint against defendants Elena Borisovna Stybel, M.D., and John Doe Defendants "1" through "10" (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover the monies that Defendants wrongfully obtained from Liberty Mutual, and expunge the pending fraudulent billing submitted by Defendants, relating to medically unnecessary, experimental, excessive, and otherwise unreimbursable healthcare services in the form of purported extracorporeal shockwave therapy ("ESWT") (collectively, the "Fraudulent Services"), which allegedly were provided to New York automobile accident victims insured by Liberty Mutual ("Insureds").

2.      Defendant Elena Borisovna Stybel, M.D. ("Stybel") is a physician who purports to have operated a professional practice under her own name and tax identification number that exclusively provided, or purported to provide, extracorporeal shockwave therapy services (the "Unincorporated Transient Shockwave Practice").  Stybel billed Liberty Mutual hundreds of thousands of dollars for the medically unnecessary, experimental, and excessive "shockwave" services, and likely billed the New York automobile insurance industry millions more, for purportedly providing the Fraudulent Services to Insureds at a series of medical clinics that primarily treat individuals with No-fault insurance ("No-fault Clinics").  Although Stybel purports to be a legitimate professional practicing medicine, the Unincorporated Transient Shockwave Practice operated on a transient basis, maintained no stand-alone office, had no patients of its own, and provided no legitimate or medically necessary services.

3.      Stybel, along with John Doe Defendants "1"-"10", perpetrated the fraudulent scheme using the Unincorporated Transient Shockwave Practice by engaging in illegal referral and kickback arrangements that permitted Stybel to access a steady stream of patients that could be subjected to the shockwave therapy services, for which the Defendants then fraudulently billed Liberty Mutual, all as part of a scheme to exploit New York's No-fault insurance system for financial gain without regard to genuine patient care.

4.      By this action Liberty Mutual seeks to recover the monies stolen from it, amounting to approximately $12,607.00, and further seeks a declaration that it is not legally obligated to pay reimbursement of the pending no-fault insurance claims for the Fraudulent Services, amounting to approximately $741,860.00, that have been submitted by or on behalf of Stybel because:

> (i)     the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;
>
> (ii)    the billing for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual;
>
> (iii)   the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal kickback arrangements; and
>
> (iv)    Stybel has systemically failed and/or refused to appear for an examination under oath that has been duly requested by Liberty Mutual, which constitutes a material breach of a condition of coverage and relieves Liberty Mutual of its obligation to pay Stybel's claims for the Fraudulent Services.

5.      As discussed herein, the Defendants at all relevant times have known that: (i) the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected

to them; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual; and (iii) the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons and through the use of illegal kickback arrangements.

6.　　As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed to Liberty Mutual.

7.　　The chart annexed hereto as Exhibit "1" set forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to Liberty Mutual.

8.　　The Defendants' fraudulent scheme began in May 2021 and has continued uninterrupted through the present day as Stybel continues to seek collection on pending charges for the Fraudulent Services.

9.　　As a result of Defendants' fraudulent scheme, Liberty Mutual has incurred damages of more than $12,607.00, and faces more than $741,860.00 in additional pending, fraudulent billing by Stybel for the Fraudulent Services.

## THE PARTIES

### I.　Plaintiffs

10.　　Plaintiffs Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are Massachusetts corporations with their principal place of business in Boston, Massachusetts.  Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

4

11.     Plaintiffs Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are Illinois corporations with their principal place of business in Boston, Massachusetts.  Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

12.     Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts.  Liberty Mutual Fire Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

13.     Plaintiff Liberty County Mutual Insurance Company is a Texas corporation with its principal place of business in Boston, Massachusetts.  Liberty County Mutual Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

14.     Plaintiffs LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are Indiana corporations with its principal place of business in Boston, Massachusetts.  LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

II.     **Defendants**

15.     Defendant Stybel resides in and is a citizen of New York.  Stybel was licensed to practice medicine in New York on April 4, 2002.

5

16.     Defendant Stybel purports to operate the Unincorporated Transient Shockwave Practice, purported to perform the Fraudulent Services, and thereafter billed Liberty Mutual for those services.

17.     The billing records submitted by Stybel to Liberty Mutual list an office address for the Unincorporated Transient Shockwave Practice as 3063 Brighton 8th Street, Floor 2, Brooklyn, New York, but there is no signage or any outside indication of Stybel actually working or operating at this address.

18.     Upon information and belief, John Doe Defendants "1"-"10" reside in and are citizens of New York.  John Doe Defendants "1"-"10" are individuals and/or entities who participated in the fraudulent scheme perpetrated against Liberty Mutual by, among other things, assisting Stybel with the operation of the Unincorporated Transient Shockwave Practice and the provision of the medically unnecessary Fraudulent Services, engaging in illegal financial and kickback arrangements to obtain patient referrals for Stybel, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

20.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

21.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

23.     Liberty Mutual underwrites automobile insurance in New York.

## I.     An Overview of the Pertinent Law Governing No-Fault Reimbursement

24.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

25.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

26.     An Insured can assign her/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

27.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

28.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

29.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ….   (Emphasis added).

30.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

31.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

32.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

33.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

34.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in

exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or allows unlicensed laypersons to share in the fees for the professional services.

35.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

36.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or her/his health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

37.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

38.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

39.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

40.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to Liberty Mutual, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     An Overview of New York's No-Fault Regulations Pertaining to Verification of Claims

41.     The No-Fault Laws obligate healthcare providers that seek payment of No-Fault Benefits to provide insurers with additional verification in order to establish proof of their claims.

42.     The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 includes a specific section entitled "Conditions", which states in part, that "upon request by the Company, the eligible injured person or that person's assignee . . . shall (b) as may reasonably be required, submit to an examination under oath by any person named by the Company, and shall subscribe to same . . . , and (d) provide any other pertinent information that may assist the Company in determining the amount that is payable."

43.     The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 also states that "No action shall lie against the Company, unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage."

44.     Additionally, 11 N.Y.C.R.R. § 65-3.5(c) states in relevant part that the "insurer is entitled to receive all items necessary to verify the claim directly from the parties from whom such verification was requested."

45.     An insurer is entitled to any information that is necessary for the insurer to determine whether the claim submitted by the healthcare provider is payable.  The issues for which additional verification can be properly sought are not limited, and can include, for example:

> (i)     whether the services provided by the healthcare provider were rendered and/or medically necessary;
>
> (ii)    whether the services were provided by persons not employed by the healthcare provider thus rendering the professional corporation ineligible pursuant to 11 NYCRR §65-3.11(a); and
>
> (iii)   whether the professional is ineligible for benefits pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) because there was a failure to comply with licensing requirements.

46.     Because an examination under oath ("EUO") is a condition of coverage, an insurer may deny a healthcare provider's or individual's claim for No-Fault Benefits if the healthcare provider or individual claimant refuses to appear for an EUO, which constitutes a material breach of the insurance policy and violation of the regulations.  The New York State Department of Insurance has confirmed this conclusion by opinion letter, dated December 22, 2006 which states:

> As referenced above in Section 65-1.1(d), the prescribed No-Fault endorsement requires that, as a condition to coverage, an eligible injured person or that person's assignee shall "…as may be

> reasonably required, submit to examinations under oath by any person named by the Company…"
>
> ***
>
> When an EUO is required and the party required to appear fails to attend a scheduled EUO, the insurer must meet its obligations under N.Y. Comp Codes R. & Regs. tit 11, §65-3.6(b) and within 10 calendar days, contact the party from whom verification (the EUO) has been requested and not provided, i.e., non-attendance at the scheduled EUO, in order to afford the party a second opportunity to attend an EUO. If the party fails to appear at the rescheduled EUO, an insurer may issue a denial of pending claims based upon the failure to meet the condition for coverage in not submitting to the requested EUO, as required under the prescribed endorsement. There is no requirement in the regulation that the denial must state the specific reason(s) why the insurer required the EUO.

<u>See</u> N.Y. State Dep't of Ins., Opinions of General Counsel, Op. Letter dated December 22, 2006, attached hereto as Exhibit "2."

## III.   <u>Defendants' Fraudulent Scheme</u>

### A.   Overview of the Scheme

47.    Beginning in May 2021, Stybel and John Doe Defendants "1"-"10" (collectively, the "Defendants"), masterminded and implemented a complex fraudulent scheme to bill Liberty Mutual and other New York automobile insurers millions of dollars for medically unnecessary, experimental, and otherwise unreimbursable services.

48.    The Fraudulent Services billed under Stybel's own name and tax identification were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

49.     The Defendants billed Liberty Mutual for the Fraudulent Services – specifically extracorporeal shockwave therapy services -- which was allegedly rendered in New York to victims of automobile accidents, including Liberty Mutual Insureds.

50.      As discussed in more detail below, extracorporeal shockwave therapy has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain, the Centers for Medicare & Medicaid Services ("CMS") has published coverage guidance stating that extracorporeal shockwave is not reasonable and necessary for the treatment of musculoskeletal conditions, and there is no legitimate peer reviewed data that establish the effectiveness of extracorporeal shockwave for the treatment of back, neck, or shoulder pain.

51.     Stybel at all relevant times practiced family medicine full-time in Amityville, New York.

52.     Stybel, at the same time that she practiced family medicine in Amityville, New York, operated the Unincorporated Transient Shockwave Practice and billed for extracorporeal shockwave services she purportedly provided to Insureds at numerous No-fault Clinics located throughout the New York metropolitan area.

53.     Stybel did not operate the Unincorporated Transient Shockwave Practice at any single, fixed location in New York, and did not have any office location of her own for the treatment of patients connected to that practice.

54.     Stybel, instead, operated in collusion with John Doe Defendants "1"-"10", on an itinerant basis from various No-fault Clinics, primarily located in Brooklyn, Queens, the Bronx, and Nassau County, New York, where she received steady volumes of patients through no efforts of her own, including at the following No-fault Clinics:

- 2088 Flatbush Avenue, Brooklyn
- 150 Graham Avenue, Brooklyn

- 652 E Fordham Road, Bronx
- 1611 East New York Avenue, Brooklyn
- 7945 Metropolitan Avenue, Flushing
- 332 East 149th Street, Bronx
- 1100 Pelham Parkway, Bronx
- 611 East 76th Street, Brooklyn
- 2386 Jerome Avenue, 2nd Floor, Bronx
- 488 Lafayette Avenue, Brooklyn
- 430 W Merrick Road, Valley Stream
- 1894 East Chester Road, Bronx
- 717 Southern Boulevard, Bronx
- 180-9 Jamaica Avenue, Jamaica
- 647 Bryant Avenue, Bronx
- 560 Prospect Avenue, Bronx
- 175 Fulton Avenue, Hempstead, New York
- 4250 White Plains Road, Bronx

55.     In order to obtain access to the No-fault Clinics' patient base (i.e., Insureds), Stybel and the other Defendants entered into illegal financial and kickback arrangements with the unlicensed persons, who provided access to the patients that were treated, or who purported to be treated, at the No-fault Clinics.

56.     The Defendants thereafter subjected Insureds at the No-fault Clinics to the medically unnecessary and illusory Fraudulent Services billed under Stybel's name; specifically extracorporeal shockwave therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

57.     In keeping with the fact that the Fraudulent Services billed under Stybel's name were provided solely to maximize profits without regard to genuine patient care, Liberty Mutual also received billing for the same experimental and investigational extracorporeal shockwave therapy services under the name of another doctor – Dr. Lorraine Riotto.

58.     The billing submitted under the name of Dr. Lorraine Riotto for the experimental and investigational extracorporeal shockwave therapy services was allegedly provided to Insureds

14

at some of the same locations where Stybel purportedly operated and was billed to Liberty Mutual using virtually the exact same form of treatment report.

59.     Tellingly, Dr. Lorraine Riotto has stated under oath that the billing for the experimental and investigational extracorporeal shockwave therapy submitted under her name to Liberty Mutual was not authorized by her and that the signatures on the treatment and claim records were forgeries and/or unauthorized duplicates.

60.     Similar to the fraudulent billing Liberty Mutual received from Dr. Lorraine Riotto, there is little evidence that Stybel herself performed any of the services or authorized the voluminous billing for such services aside from the repeated use of a photocopied signature of Stybel on the treatment reports.

61.     Similar to the fraudulent billing Liberty Mutual received from Dr. Lorraine Riotto, Stybel and the John Doe Defendants "1"-"10" typically billed Liberty Mutual $700.39 for each extracorporeal shockwave treatment allegedly rendered to an Insured.

62.     Similar to the fraudulent billing Liberty Mutual received from Dr. Lorraine Riotto, Stybel and the John Doe Defendants "1"-"10" often billed three, six, or more extracorporeal shockwave treatment sessions to each Insured, resulting in thousands of dollars in charges per Insured.

63.     Stybel and the John Doe Defendants "1"-"10", knowing that extracorporeal shockwave was experimental, investigational, not approved by the FDA, and considered by CMS to be not reasonable and not necessary for the treatment of musculoskeletal conditions, made efforts to limit the information regarding Stybel and the Unincorporated Transient Shockwave Practice in connection with the billing submissions to Liberty Mutual.

15

64.     For example, when Liberty Mutual commenced an investigation of Stybel and the Unincorporated Transient Shockwave Practice, Stybel systematically failed and/or refused to comply with Liberty Mutual's requests made in accordance with the No-fault regulations seeking additional verification of the underlying claims and charges.

65.     The Defendants billed Liberty Mutual more than $754,000.00 for extracorporeal shockwave treatments of musculoskeletal conditions purportedly provided to Liberty Mutual Insureds over a period of only two months.

**B.      The Illegal Kickback and Referral Relationships at the Clinics**

66.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the No-fault Clinics in actuality were organized to supply "one-stop" shops for no-fault insurance fraud.

67.     Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the No-fault Clinics, and dictated fraudulent protocols used to maximize profits without regard to actual patient care.

68.     Stybel did not have her own patients at the No-fault Clinics and did nothing to create a patient base.

69.     Stybel did not advertise for patients, never sought to build name recognition or make any legitimate efforts of her own to attract patients on behalf of herself or the Unincorporated Transient Shockwave Practice at the Clinics.

70.     Stybel did virtually nothing that would be expected of the owner of legitimate professional practice to develop its reputation and attract patients to the No-fault Clinics.

71.     As Stybel did not have any patients of her own at the No-fault Clinics, the healthcare services that she could provide to the patients at the No-fault Clinics was limited and

16

controlled by the owners of the No-fault Clinics, who were interested only in maximizing profits without regard to genuine patient care.

72. The No-fault Clinics provided facilities for Stybel, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's No-fault insurance system.

73. In fact, Liberty Mutual received billing from many of the No-fault Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-fault insurance system.

74. For example, at the No-fault Clinic located at 4250 White Plains Road, Bronx, Liberty Mutual has been billed by over 35 purportedly separate healthcare providers in the last three years. In fact, Liberty Mutual has been advised by psychiatrist whose name was used to bill for shockwave therapy from this location that his license was used without his consent or knowledge. Liberty Mutual also has learned that the owner of two physical therapy professional corporations that operated at this location improperly "loaned" his physical therapy license to laypersons who then billed for medically unnecessary range of motion tests.

75. As a further example, at the No-fault Clinic located at 430 W Merrick Road, Valley Stream, Liberty Mutual has been billed by over 40 purportedly separate healthcare providers in the last four years. Liberty Mutual has learned, among other things, that five physical therapy providers that billed from this address allowed their physical therapy license to be improperly used

by others, while at least one doctor has stated that excessive and unnecessary treatments were billed under his name at this location without his consent.  Further, two other doctors that had billings submitted to Liberty Mutual tied to this location had their New York medical licenses revoked for various reasons.

76.     As a further example, at the No-fault Clinic located at 717 Southern Blvd, Bronx, Liberty Mutual has been billed by over 50 purportedly separate healthcare providers in the last five years.  Among other things, this location was identified in a publicly filed State Farm lawsuit as being illegally controlled by laypersons who directed a pre-determined treatment protocol, with individual providers rendering excessive and unnecessary treatment as part of the protocol.  See State Farm Mutual Automobile Ins. Co. et al v. Metro Pain Specialists P.C. et al, 21-cv-05523 (E.D.N.Y. 2021)

77.     Furthermore, upon information and belief, one or more of the No-fault Clinics from which Stybel operated are part of the clinics at issue in United States of America v. Anthony Rose, et al., 19-cr-00789 (PGG) (S.D.N.Y.) ("USA v. Rose"), wherein numerous individuals were indicted for paying bribes to 911 operators, medical personnel, NYPD officers, and others in exchange for confidential patient information that was used to steer them to a network of medical clinics (and lawyers) where the clinic controllers paid kickbacks in exchange for the referrals.

78.     Stybel, in order to obtain access to the No-fault Clinics' patient base (i.e. Insureds), entered into illegal financial arrangements with unlicensed persons, who "brokered" or "controlled" patients that were treated, or who purported to be treated, at the No-fault Clinics.

79.     The financial arrangements that Stybel entered into included the payment of fees ostensibly to "rent" space or personnel from the No-fault Clinics or fees for ostensibly legitimate business services.

80.     However, the financial arrangements that Stybel entered into were actually "pay-to-play" arrangements that caused unlicensed laypersons to steer Insureds to Stybel for medically unnecessary services at the No-fault Clinics.

81.     Stybel and the other Defendants made the various kickback payments in exchange for having Insureds referred to the Unincorporated Transient Shockwave Practice for the medically unnecessary Fraudulent Services at the No-fault Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

82.     The amount of kickbacks paid by the Defendants generally was based on the volume of Insureds that were steered to Stybel for the purported medically unnecessary services.

83.     Stybel had no genuine doctor-patient relationship with the Insureds that visited the No-fault Clinics, as the patients had no scheduled appointments with Stybel.

84.     Having no scheduled appointments, the Insureds were simply directed by the No-fault Clinics, and the unlicensed persons associated therewith, to subject themselves to treatment by Stybel whenever she or the Unincorporated Transient Shockwave Practice happened to be present at the No-fault Clinic, because of the kickbacks paid by Stybel and the other Defendants.

85.     In keeping with the fact that patients were referred to Stybel at the No-fault Clinics in exchange for kickbacks, Stybel provided no medically necessary services and, but for the payment of kickbacks, there would be no reason for any referral to the Unincorporated Transient Shockwave Practice.

86.     The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships because without access to the Insureds, the Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill Liberty Mutual and other insurers.

87.     Stybel and the other Defendants at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

88.     In fact, Stybel and the other Defendants operated the Unincorporated Transient Shockwave Practice in a "quick-hit" fashion, billing Liberty Mutual and other New York automobile insurers as fast as possible, including billing Liberty Mutual alone more than $754,000.00 over a two-month period, in order to limit the opportunity for insurance companies to investigate the Unincorporated Transient Shockwave Practice before Defendants reaped their ill-gotten gains.

89.     Defendants, after quickly and excessively billing Liberty Mutual for the Fraudulent Services conducted over a short period, ceased all treatment activity and shuttered the Unincorporated Transient Shockwave Practice without explanation, continuing only to hire law firms to pursue collection of the fraudulent charges from Liberty Mutual and other insurers.

## C.     The Defendants' Fraudulent Treatment and Billing Protocol

90.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, Stybel and the other Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol involving extracorporeal shockwave without regard for the Insureds' individual symptoms or presentation.

91.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under her or her auspices. Rather, Stybel permitted the fraudulent treatment and billing protocol described below to proceed under her auspices because she sought to profit from the fraudulent billing submitted to Liberty Mutual and other insurers.

### 1.     The Fraudulent Charges for Extracorporeal Shockwave Therapy

92.     Stybel and the other Defendants purported to subject every Insured "treated" by the Unincorporated Transient Shockwave Practice to medically unnecessary extracorporeal shockwave therapy "treatments."

93.     Stybel and the other Defendants then billed for extracorporeal shockwave therapy through the Unincorporated Transient Shockwave Practice under CPT code 0101T, which is listed in the Fee Schedule as a "temporary code" identifying emerging technology. Temporary codes may become permanent codes or deleted during updates of the code set.

94.     The Defendants' billing for extracorporeal shockwave through the Unincorporated Transient Shockwave Practice under CPT code 0101T generally resulted in charges of $700.39 for each single extracorporeal shockwave treatment that they purported to provide.

95.     The Defendants typically charged Liberty Mutual for multiple sessions of extracorporeal shockwave per Insured, resulting in charges in the thousands of dollars per Insured.

96.     Pursuant to the Fee Schedule, CPT code 0101T applies to "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy".

97.     Extracorporeal shockwave treatment is a nonsurgical treatment that involves the delivery of high energy shock waves to musculoskeletal areas of the body with the purported goal of reducing pain and promoting the healing of affected soft tissue.

98.     During extracorporeal shockwave treatment, the practitioner moves an applicator over a gel-covered treatment area.  As the applicator is moved over the treatment area, high energy shock waves that purportedly stimulate the metabolism, enhance blood circulation, and accelerate the healing process are released into the treatment area.

99.     Typically, Defendants purportedly performed extracorporeal shockwave treatments on Insureds who were purportedly experiencing musculoskeletal pain, including back, shoulder, and/or neck pain.

100.     In a legitimate clinical setting, treatment for neck, back, or shoulder pain should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

101.     If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.  These clinical approaches are well-established.

102.     By contrast, the use of extracorporeal shockwave for the treatment of back, neck, and shoulder pain is experimental and investigational.

103.     In keeping with the fact that extracorporeal shockwave for the treatment of back, neck, and shoulder pain is not a legitimate treatment option, extracorporeal shockwave has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain.

104.     In addition, the Centers for Medicare & Medicaid Services has published coverage guidance for extracorporeal shockwave stating that further research is needed to establish the efficacy and safety of extracorporeal shockwave in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

105. What is more, there is no legitimate peer reviewed data that establishes the effectiveness of extracorporeal shockwave for the treatment of back, neck, or shoulder pain.

106. In keeping with the fact that extracorporeal shockwave for the treatment of musculoskeletal conditions is not a legitimate treatment option: (i) Aetna insurance company considers extracorporeal shockwave experimental and investigational for the treatment of low back pain, lower limb conditions, and other musculoskeletal indications and, as such, does not cover it; (ii) UnitedHealth Group Incorporated care does not cover extracorporeal shockwave for the treatment of musculoskeletal or soft tissue indications due to insufficient evidence of its efficacy in those applications; (iii) the Blue Cross Blue Shield Association does not cover extracorporeal shockwave for the treatment of musculoskeletal conditions because it is considered investigational; and (iv) Cigna considers extracorporeal shockwave experimental, investigational, or unproven for any indication, including the treatment of musculoskeletal conditions and soft tissue wounds, and therefore does not cover it.

107. The Defendants' billing for extracorporeal shockwave treatments through the Unincorporated Transient Shockwave Practice was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to such treatments.

108. In keeping with the fact that the purported extracorporeal shockwave was provided without regard to the needs of the patient, the Defendants typically submitted a boilerplate, check-off treatment reports containing a "stamped" signature of Stybel, rather than an actual signature.

109. In many cases, the Defendants purported to provide the experimental extracorporeal shockwave treatments to Insureds soon after their accident and without giving the patients the opportunity to sufficiently respond to more established, conservative physical therapy.

110.    For example, many Insureds were subjected to the experimental extracorporeal shockwave treatments by the Unincorporated Transient Shockwave Practice less than 20 days after their accidents, including many who were subjected to such treatments within 2 weeks of their accidents.  For example:

(i)     The Defendants purported to provide extracorporeal shockwave through The Unincorporated Transient Shockwave Practice to an Insured named RP on March 22, 2021, only seven days after the Insured's accident on March 15, 2021.

(ii)    The Defendants purported to provide extracorporeal shockwave through The Unincorporated Transient Shockwave Practice to an Insured named MS on May 21, 2021, only six days after the Insured's accident on May 15, 2021.

(iii)   The Defendants purported to provide extracorporeal shockwave through The Unincorporated Transient Shockwave Practice to an Insured named NM on March 23, 2021, only one day after the Insured's accident on March 22, 2021.

(iv)    The Defendants purported to provide extracorporeal shockwave through The Unincorporated Transient Shockwave Practice to an Insured named GM on May 14, 2021, only three days after the Insured's accident on May 11, 2021.

(v)     The Defendants purported to provide extracorporeal shockwave through The Unincorporated Transient Shockwave Practice to an Insured named RC on August 17, 2021, only six days after the Insured's accident on August 11, 2021.

(vi)    The Defendants purported to provide extracorporeal shockwave through The Unincorporated Transient Shockwave Practice to an Insured named JR on August 10, 2021, only six days after the Insured's accident on August 4, 2021.

(vii)   The Defendants purported to provide extracorporeal shockwave through The Unincorporated Transient Shockwave Practice to an Insured named CC on August 12, 2021, only eleven days after the Insured's accident on August 1, 2021.

(viii)  The Defendants purported to provide extracorporeal shockwave through The Unincorporated Transient Shockwave Practice to an Insured named RU

on August 16, 2021, only twelve days after the Insured's accident on August 4, 2021.

(ix)   The Defendants purported to provide extracorporeal shockwave through The Unincorporated Transient Shockwave Practice to an Insured named YD on August 25, 2021, only thirteen days after the Insured's accident on August 12, 2021.

111.   In keeping with the fact that the extracorporeal shockwave treatments purportedly performed by the Unincorporated Transient Shockwave Practice were not medically necessary and performed pursuant to predetermined protocols to maximize profits, the Unincorporated Transient Shockwave Practice routinely provided the same number of treatment sessions of extracorporeal shockwave to multiple Insureds involved in the same accident at or about the same time.  For example:

(i)    Two Insureds — ZM and GM– were involved in the same automobile accident on May 11, 2021.  Thereafter, both of these Insureds received six sessions of the experimental EWST.

(ii)   Two Insureds — LL and KK -- were involved in the same automobile accident on March 15, 2021.   Thereafter, both of these Insureds received twelve sessions of the experimental EWST

(iii)  Three Insureds – RVH, SU, and JU -- were involved in the same automobile accident on October 25, 2020.  Thereafter, all three Insureds received three sessions of the experimental extracorporeal shockwave.

(iv)   Three Insureds – AN, KN, and AN – were involved in the same automobile accident on May 23, 2021.  Thereafter, all three Insureds received six sessions of the experimental extracorporeal shockwave.

(v)    Two Insureds – AD and BM – were involved in the same automobile accident on April 9, 2021. Thereafter, both of these Insureds received three sessions of the experimental extracorporeal shockwave.

(vi)   Two Insureds – NO and SR – were involved in the same automobile accident on June 1, 2021. Thereafter, both of these Insureds received three sessions of the experimental extracorporeal shockwave.

(vii)    Two Insureds – BC and BR -- were both involved in the same automobile accident on July 20, 2021. Thereafter, both of these Insureds received six sessions of the experimental extracorporeal shockwave.

(vii)    Two Insureds – DJ and MW – were involved in the same automobile accident on May 31, 2021. Thereafter, both of these Insureds received three sessions of the experimental extracorporeal shockwave.

(ix)    Two Insureds – DW and SA – were involved in the same automobile accident on June 26, 2021. Thereafter, both of these Insureds received three sessions of the experimental extracorporeal shockwave.

(x)    Two Insureds – SR and DW – were involved in the same automobile accident on August 9, 2021. Thereafter, both of these Insureds received three sessions of the experimental extracorporeal shockwave.

112.    It is improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology that would require experimental extracorporeal shockwave treatments, to the extent extracorporeal shockwave was even medically necessary.

113.    It is also improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology that would require the virtually identical number of experimental extracorporeal shockwave treatments, to the extent extracorporeal shockwave was even medically necessary.

114.    Furthermore, the Defendants' charges for the medically unnecessary extracorporeal shockwave also were fraudulent in that the Defendants did not even actually provide high energy extracorporeal shockwave that satisfied the requirements of CPT code 0101T.

115.    Instead, the Defendants actually provided Radial Pressure Wave Therapy.

116.    Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave.

26

117.     Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T.

118.     In fact, the Defendants utilized a portable, compact radial wave pressure device that does not even purport to be able to provide the high energy capacity necessary to produce a true shock wave.

119.     Accordingly, even if the extracorporeal shockwave was approved for, or had any documented effectiveness for, the treatment of back, neck, and shoulder pain – which it does not – the Unincorporated Transient Shockwave Practice did not even provide the high energy extracorporeal shockwave treatments, but merely a form of pressure wave therapy that the Defendants fraudulently billed under CPT code 0101T.

120.     Moreover, even if the Defendants did provide high energy extracorporeal shockwave treatments in compliance with the code requirements, the Defendants nevertheless inflated the charges permissible for such high energy extracorporeal shockwave services.

121.     For qualifying services, CPT code 0101T allows a single charge for "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy"

122.     The Defendants, in order or fraudulent inflate the charges to insurers, typically billed for multiple charges per day for each Insured based on the number of body parts that were provided with extracorporeal shockwave services, rather than billing a *single charge* for services involving *the musculoskeletal system*.

123.     In short, the billing for extracorporeal shockwave treatments was part of the Defendants' fraudulent treatment and billing protocol, was designed solely to financially enrich the Defendants, and had absolutely nothing to do with genuine patient care.

IV.     **Defendant's Failure to Comply with Liberty Mutual's Requests for
        Additional Verification in the Form of an Examination Under Oath**

124.    Stybel has systematically failed and/or refused to comply with Liberty Mutual's requests for additional verification of her No-fault insurance claims, including Liberty Mutual's requests for an examination under oath ("EUOs"), and such conduct constitutes a material breach of a condition of coverage that relieves Liberty Mutual of its obligation to pay the Defendants' claims.

125.    Based upon Liberty Mutual's investigation and the totality of the circumstances, Liberty Mutual concluded that serious questions existed that warranted Stybel's formal appearance for an EUO.

126.    Liberty Mutual had – and continues to have – a reasonable basis to seek additional verification from Stybel in order to, among other things, verify the medical necessity of the Fraudulent Services, whether the Fraudulent Services were provided in the first instance, whether Stybel was entitled to bill for or to collect No-fault benefits with respect to the Fraudulent Services, and to look beyond her facially-valid medical license to determine whether there was a failure to abide by material state and local licensing laws.

127.    Accordingly, beginning in or about October 2021, Liberty Mutual elected to make formal requests for additional verification, including a request for an EUO, from Stybel, in accordance with the No-fault regulations.

128.    Liberty Mutual's requests for additional verification were made in accordance with the insurance policies under which Stybel's No-fault claims were submitted, and pursuant to the No-fault laws. The object of these requests was to permit Stybel to answer questions Liberty Mutual had about Stybel's billing, treatment practices and the legitimacy of the Unincorporated Transient Shockwave Practice.

129.   Liberty Mutual made multiple requests for additional verification, including requests for an EUO of Stybel, from October 2021 to the present.

130.   Each request by Liberty Mutual for an EUO and additional verification was timely and properly made pursuant to the No-fault laws.

131.   Stybel, through her collection counsel, responded to certain of Liberty Mutual's requests for additional verification by, among other things, objecting and purporting to request an adjournment of the EUO to "accommodate her schedule."

132.   In fact, Stybel, through her collection counsel, repeatedly requested an adjournment of the EUO throughout November 2021, December 2021, January 2021, and February 2021. However, at no time did Stybel offer any future date as to when she would appear for an EUO or even engage in any discussion about scheduling the EUO with Liberty Mutual.

133.   Liberty Mutual also offered to schedule the EUO "virtually" through video-technology, to make the EUO as convenient as possible to Stybel, but Stybel never accepted that alternative or engaged in any discussion about trying to schedule a "virtual" EUO.

134.   Stybel's repeated requests for adjournments, without any explanation and without any attempt to actually schedule the EUO, amount to a systematic failure and/or has refusal to appear for any examination under oath.

135.   Stybel's systematic failure and/or refusal to appear for an EUO constitutes a material breach of Liberty Mutual's policies and the No-fault laws and, as such, relieves Liberty Mutual from any obligation to pay on any of the claims for the Fraudulent Services.

136.   In connection with Stybel's refusal to appear for an EUO, Liberty Mutual issued various timely denials of claims submitted by Stybel on the prescribed NF-10 form, stating in relevant part that Stybel failed to comply with her obligation to present a proper proof of claim by

failing to attend the EUO, and that the charges were denied because she failed to satisfy a condition of coverage.

## V.   The Fraudulent Billing Defendants Submitted or Caused to be Submitted to Liberty Mutual

137.   To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through the Defendants to Liberty Mutual seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

138.   The Defendants' billing forms (*i.e*, NF-3 and/or HCFA-1500 forms) and treatment reports submitted to Liberty Mutual by and on behalf of Stybel and the Unincorporated Transient Shockwave Practice were false and misleading in the following material respects:

    (i)    The billing forms and supporting documentation submitted by and on behalf of Stybel and the Unincorporated Transient Shockwave Practice uniformly misrepresented to Liberty Mutual that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services, to the extent provided at all, were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

    (ii)    The billing forms and supporting documentation submitted to Liberty Mutual by and on behalf of Stybel and the Unincorporated Transient Shockwave Practice uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

    (iii)    The billing forms and supporting documentation submitted by and on behalf of Stybel and the Unincorporated Transient Shockwave Practice uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed layperson and illegal kickback arrangements amongst the Defendants and others.

## VI.   Defendants' Fraudulent Concealment and Liberty Mutual's Justifiable Reliance

139.   Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to Liberty Mutual.

140.    To induce Liberty Mutual to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

141.    Specifically, the Defendants knowingly misrepresented and concealed facts related to Stybel in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

142.    Additionally, the Defendants entered into complex financial arrangements that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

143.    Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

144.    Additionally, the Defendants intentionally operated the Unincorporated Transient Shockwave Practice for only a few months in order to avoid being subjected to any insurance company investigation.

145.    The Defendants also hired law firms to pursue collection of the fraudulent charges from Liberty Mutual and other insurers. These law firms routinely filed expensive and time-consuming litigation against Liberty Mutual and other insurers if the charges were not promptly paid in full.

146.    The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent

scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

147.    Liberty Mutual is under statutory and contractual obligations to promptly and fairly process claims within 30 days. Liberty Mutual takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.

148.    The facially-valid documents submitted to Liberty Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause Liberty Mutual to rely upon them. As a result, Liberty Mutual incurred damages of more than $12,607.00 based upon the fraudulent charges.

149.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Liberty Mutual, Liberty Mutual did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against Stybel**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

150.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

151.    There is an actual case in controversy between Liberty Mutual and the Defendants regarding more than $741,860.00 in fraudulent billing for the Fraudulent Services that has been

submitted to Liberty Mutual under the name of the Elena Borisovna Stybel, M.D. (*i.e.*, the Unincorporated Transient Shockwave Practice.).

152.    Stybel has no right to receive payment for any pending bills submitted to Liberty Mutual because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

153.    Stybel has no right to receive payment for any pending bills submitted to Liberty Mutual because the billing for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual.

154.    Stybel has no right to receive payment for any pending bills submitted to Liberty Mutual because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons and using illegal kickback payments paid for patient referrals.

155.    Stybel has no right to receive payment for any pending bills for the Fraudulent Services submitted to Liberty Mutual because Stybel systemically failed and/or refused to appear for an examination under oath that has been duly requested by Liberty Mutual in accordance with the No-fault regulations, which constitutes a material breach of a condition of coverage and relieves Liberty Mutual of its obligation to pay the claims for the Fraudulent Services.

156.    Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Stybel has no right to receive payment for any pending bills submitted to Liberty Mutual.

## AS AND FOR A SECOND CAUSE OF ACTION
### Against Stybel
### (Common Law Fraud)

157.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

158.    Stybel intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

159.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Stybel; (ii) in every claim, the representation that Stybel and the Unincorporated Transient Shockwave Practice were properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact they were not properly licensed as they were rendering healthcare services pursuant to the dictates of unlicensed laypersons and using an illegal kickback scheme; and (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual.

160.    Stybel intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted

through the Unincorporated Transient Shockwave Practice that were not compensable under the No-Fault Laws.

161.     Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $12,607.00 pursuant to the fraudulent bills submitted by Defendants. The chart annexed hereto as Exhibits "1" set forth a representative sample of the fraudulent claims that have been identified to-date that Stybel submitted, or caused to be submitted, to Liberty Mutual.

162.     Stybel's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

163.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
**Against Stybel**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

164.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

165.     The Unincorporated Transient Shockwave Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

166.     Stybel knowingly has conducted and/or participated, directly or indirectly, in the conduct of the Unincorporated Transient Shockwave Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent

charges seeking payments that the Unincorporated Transient Shockwave Practice was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (ii) the billing for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iii) the Unincorporated Transient Shockwave Practice was not properly licensed and it was rendering healthcare services pursuant to the dictates of unlicensed laypersons and using an illegal kickback scheme.   The fraudulent billings and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

167.   The Unincorporated Transient Shockwave Practice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Stybel operated the Unincorporated Transient Shockwave Practice, inasmuch as the Unincorporated Transient Shockwave Practice never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Unincorporated Transient Shockwave Practice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through the Unincorporated Transient Shockwave Practice to the present day.

168.   The Unincorporated Transient Shockwave Practice is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to Liberty Mutual and other insurers.  These inherently unlawful acts are taken by the Unincorporated

Transient Shockwave Practice in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent no-fault billing.

169.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $12,607.00 pursuant to the fraudulent bills submitted by the Defendants through Unincorporated Transient Shockwave Practice.

170.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Against Stybel and John Doe Defendants "1-10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

171.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

172.    The Unincorporated Transient Shockwave Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

173.    Stybel and John Doe Defendants "1-10" are employed by and/or associated with the Unincorporated Transient Shockwave Practice.

174.    Stybel and John Doe Defendants "1"-"10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Unincorporated Transient Shockwave Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the Unincorporated Transient Shockwave Practice was not eligible to receive under the No-Fault

Laws because: (i) the billed-for-services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (ii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iii) the Unincorporated Transient Shockwave Practice was not properly licensed and was rendering healthcare services pursuant to the dictates of unlicensed laypersons and using an illegal kickback scheme. The fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise the pattern of racketeering activity identified through the date of the Complaint are described in the chart annexed hereto as Exhibit "1."

175.     Stybel and John Doe Defendants "1-10" knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of fraudulent charges to Liberty Mutual.

176.     Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $12,607.00 pursuant to the fraudulent bills submitted by Defendants through the Unincorporated Transient Shockwave Practice.

177.     By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Against Stybel**
**(Unjust Enrichment)**

178.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

179.    As set forth above, Stybel has engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

180.    When Liberty Mutual paid the bills and charges submitted by or on behalf of the Unincorporated Transient Shockwave Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Stybel's improper, unlawful, and/or unjust acts.

181.    Stybel has been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

182.    Stybel's retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

183.    By reason of the above, Stybel has been unjustly enriched in an amount to be determined at trial, but in no event less than $12,607.00.

### AS AND FOR A SIXTH CAUSE OF ACTION
**Against John Doe Defendants "1-10"**
**(Aiding and Abetting Fraud)**

184.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

185.    John Doe Defendants "1-10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Stybel using the Unincorporated Transient Shockwave Practice.

186.    The acts of John Doe Defendants "1-10" in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of the Unincorporated Transient Shockwave Practice and the provision of medically unnecessary services, engaging in

illegal financial and kickback arrangements to obtain patient referrals for the Unincorporated Transient Shockwave Practice, and spearheading the pre-determined fraudulent protocols for healthcare services used to maximize profits without regard to genuine patient care.

187.    The conduct of John Doe Defendants "1-10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1-10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Stybel to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from Liberty Mutual and other insurers for the Fraudulent Services.

188.    John Doe Defendants "1-10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Stybel for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

189.    The conduct of John Doe Defendants "1-10" caused Liberty Mutual to pay more than $12,607.00 pursuant to the fraudulent bills submitted by Stybel using the Unincorporated Transient Shockwave Practice.

190.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

191.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory damages in no event less than $12,607.00, along with punitive damages, interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

192.    Pursuant to Federal Rule of Civil Procedure 38(b), Liberty Mutual demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, Liberty Mutual Indemnity Company, Liberty Mutual General Insurance Company and Liberty Mutual Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Stybel, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Stybel has no right to receive payment for any pending bills for the Fraudulent Services submitted to Liberty Mutual, amounting to approximately $741,860.00;

B.    On the Second Cause of Action against Stybel, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $12,607.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

C.    On the Third Cause of Action against Stybel, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $12,607.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Stybel and John Doe Defendants "1-10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $12,500.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against Stybel, more than $12,607.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

F.      On the Sixth Cause of Action against John Doe Defendants "1-10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $12,607.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper.

Dated:  March 28, 2022
        Uniondale, New York

                                        RIVKIN RADLER LLP


                                        By:   /s/ Michael A. Sirignano
                                                Michael A. Sirignano, Esq.
                                                Barry I. Levy, Esq.
                                                Frank P. Tiscione, Esq.
                                        926 RXR Plaza
                                        Uniondale, New York 11556
                                         (516) 357-3000

                                        *Counsel for Plaintiffs Liberty Mutual
                                        Insurance Company, Liberty Mutual Fire
                                        Insurance Company, Liberty Insurance
                                        Corporation, The First Liberty Insurance
                                        Corporation, LM Insurance Corporation,
                                        Liberty Mutual Mid-Atlantic Insurance
                                        Company, Liberty County Mutual Insurance
                                        Company, LM Property and Casualty
                                        Insurance Company, Safeco Company of
                                        Indiana, and American States Insurance
                                        Company*

5706989.v3